We move to the second case this morning. Legato Vapors LLC v. David Cook And we know that with dairy there are concerns about purity and quality and public health and packaging, right? Yes. So could New York or Illinois tell dairy farmers in Wisconsin or Vermont how their barns have to be built, what kind of locks they have to put on their barns, and how much they have to pay their workers? They could in the certain situation that is here. The difference with dairy products and food products in general is you have the FDA regulating everything. Assume there's no FDA. Right. Go back to 1880. Right. Could New York do that? I think they could in the case that you have Wisconsin or whoever not regulating the process of dairy products. Wisconsin says we don't care about what the barns are made of, how they're designed, what kind of locks they have on them, but you in the consuming state can apply, you can test the products, you can insist that we meet certain quality standards, but you can't tell us how to make them. I asked Mr. Tanford, what's the closest case you've got to regulating out-of-state manufacturing processes? There aren't any. The Rocky Mountain case, as he said, is probably the closest. You describe it as simply involving reporting requirements, right? That is one of the things. As opposed to the substantive requirements that are imposed here. Yes, Your Honor. So this sounds to me like a truly unprecedented effort to extend regulatory authority way beyond the state's borders. It is definitely stronger than any case law that has been before. With the extraterritoriality doctrine, though, Your Honor, the statute is either extraterritorial or it's not. Appellant has stated many times in their brief that the extent of the regulations don't matter. So the boundary that I'm trying to be interested in your comment on, since we have plaintiffs, at least in the appellate court, are acknowledging that the state can impose its regulations for packaging, labeling, testing, quality control, and so on, for the products that wind up in India. But given that the manufacturing processes occur outside the state, why isn't that a reasonable line, in essence, between manufacturing processes and the product that results? Because as a practical matter, if you're waiting until it gets into the borders, unless you're going to be able to test every single one, then the manufacturing process is what needs to be regulated. Why aren't spot checks enough to satisfy the state's concern? Well, Your Honor, the evidence that was specifically in front of the General Assembly when they took on the statute, there were manufacturers. They were literally people just walking in the back of their store and stirring this stuff up by hand. Okay. Well, is that in the district court record? Yes. Where is it? It was actually a video shown. It was attached to, I believe, the state's motion for summary judgment. It was a video that was actually shown to the General Assembly during discussion of the statute. And from that video, we infer that the only way to regulate this effectively is this unprecedented reach of the state's powers across its border. That's what you're arguing? Yes, Your Honor. Can we talk about the security requirements? Why an outside contractor? That is what the General Assembly decided. What I can tell you is the concern was the security firm needing to meet certain requirements so that that way they could make sure that there was a certain quality of security. Would you care to comment on the GoodCat Court's findings that there's only one company in the United States of America that meets that criteria and that the bill was adjusted as it went along when it turned out it had been grafted incorrectly so as to disqualify that firm and was quickly amended so that it would be able to qualify? I'm very familiar with that, Your Honor. I actually argued that at the district court. That is an as-applied disparate impact challenge. I'm more interested in just the extraordinary phenomenon. I agree that that was definitely a surprising fact. The General Assembly, though, has already stated that they are going to remedy that in the upcoming session. Legislators promise a lot of things about upcoming sessions, and I'm wondering if they might not want to do some other corrections to this Do you have any thoughts on the severability of the different requirements here? Are we talking about the security firm or are we talking back on the Congress clause? More broadly, with respect to efforts to reach out-of-state manufacturing processes, the design of facilities, the commercial kitchen requirements, the security requirements, et cetera. Your Honor, honestly, you could basically just knock off Section 7.1-7-6-3, subsection A, and that makes everything better. That is the clause that talks about how anything that ends up in Indiana, or if you're the manufacturer, you send it there, you're violating the code. If you take that off, then the only ones that are going to get in trouble if there is an unpermitted e-liquid being sold in Indiana are the retailers, and that's how the statute is actually being enforced. I know, as I said, that's not in front of the court at this point. But then the only factories and manufacturers that are being regulated are the ones that sought a permit. At that point, they've consented to Indiana's regulation. What about the ones that did not seek a permit and the product ends up at a retailer in Indiana? Well, if that subsection is struck? Well, if it's still there, I guess. Right. Well, yes, I mean, that does violate the code. So you're going to say they're just not enforcing it? Yes, because I think even the state and the ATC would realize that would cause a commerce clause issue if they were just willy-nilly running into any factory that they found a single e-liquid. Well, as I said at the outset, I worry somewhat about a user who buys it out of state and then brings some in and uses it in Indiana. Now, obviously, if he's sharing it with his friends and doing some other things, that starts to spread it out a little bit. But is that person violating the law? Yes, I can say that, again, it's something that's not necessarily going to be enforced. But also, Your Honor, some states have now legalized marijuana. Indiana has not legalized it. If they go and buy it in a state that's legalized it and they bring it to Indiana, it's still illegal in Indiana. That's not created a commerce clause issue. Their seller, has their seller violated Indiana law? I'm sorry? Has the person who sold it to them in Colorado violated Indiana law? I don't believe so. I don't think so either. What about federal law? Well, yes. Well, Your Honor, to be honest, I think the federal law is probably going to take care of a lot of this case eventually once that's enacted, and the statute actually alludes to that. Your Honor, I also wanted to point out a couple of things that were mentioned. One, as far as the audits, if the ATC individual were to see, whoever, Nevada, California, products that are being sent to another place, he might see them, but he's not enforcing regulations on those products. What's audited? What's the audit for? That's just how they go to check to make sure that the manufacturer is complying with the requirements. It applies to all the requirements, all the Indiana requirements? As to the manufacturer. Okay. Yeah. There are separate sections of requirements. The requirements specifically for the manufacturer would apply once you receive the permit. So even if the manufacturer has not gotten a certificate and their stuff, their e-liquid is being sold in Indiana, the violation is that they sold it without a certificate. It's not necessarily that they didn't have X, X, and X of the manufacturing requirements, because those only apply to a manufacturer who has a permit. Those are the requirements you have to meet to get and retain your permit. But if you don't have a permit, you violated the law if your product winds up in Indiana, right? Correct. Okay. Yes. Now, also, Your Honor, I would point out, too, with like the labeling cases, the emission standards cases, granted they're to a lesser extent, but those labels were still being placed in the factory in the other state. I believe the exact case we were talking, it was Vermont, the Sorrell case. Yes, National Electrical Manufacturers Association, right? Right. And there was the argument made in that case that that's going to throw off their labeling process nationwide. And the Second Circuit found that that doesn't matter because it's only applying to the products that are coming into the state. Right, and it's just labels. Right, Your Honor, but under the extraterritoriality, it doesn't matter whether it's labels or something much greater. So your theory under extraterritoriality is that once the courts say it's okay for a state to require state-specific labels, then the sky's the limit. You can regulate wages. You can regulate security arrangements. You can regulate building design, every operational aspect. No, not wages or anything like that, Your Honor. Why not wages? Indiana, let's imagine a very different Indiana legislature that says, we are really worried about the quality of workers that you're going to get if you don't pay high enough wages, whether it's manufacturing e-liquids or milking cows in Vermont. So we're going to insist, you know, as with security, the same logic with the security requirements, we're really worried about the quality, and we want well-paid workers to produce these products that are going to be used and sold in Indiana. Why is that not driven by your logic? Because, Your Honor, the statute is specifically talking about preventing the adulteration and contamination of e-liquids. The only reason that they're regulating it at the manufacturing level is it's not practical to be able to regulate it once it comes into Indiana. If they do random checks, that doesn't do any good. If you don't happen to randomly check the ones that are contaminated, the wages in another state, that's not going to the contamination or the adulteration. And that's the only reason why the statute, if Indiana just decided we're going to regulate. Why do the terms of the security contract link any more closely to contamination or adulteration? Because that was the evidence that was put in front of the court. They talked to security experts, and that was what they were told. Your Honor, if it's not extraterritorial, the requirements are only subject to rational basis. And as long as a rational legislator could have thought that those regulations were necessary to meet the security needs of the statute, then that's all that it required. There are no further questions, Your Honors. We ask that you affirm the district court. Thank you. How much time? You have about a minute. I was going to say the red light went off. You don't have to confess that. I would just make a couple of quick points. One is to the Attorney General's opening remarks that no transactions taking place outside Indiana are affected. It was stipulated that this act affects out-of-state transactions between producers and distributors and producers and out-of-state retailers. It was also stipulated in the joint stipulations that the production of liquid intended for sale in other states would be controlled by Indiana's rules under this statute. Secondly, they alluded to the videotape shown to the legislature as basically trying to make the case that this was a, I believe, Wild West production to justify the need to regulate production itself. First place that would only let them regulate production within Indiana, but in the second place, that tape was very old. This is a new industry, and the record also shows that the industry has itself been taking steps to improve production, to eliminate these kind of mom-and-pop mixing shops, and to move their production to national ISO certified facilities. Thank you. Thank you. Thanks to both counsel. The case is taken under advisement.